UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

VERGIL MCBEAN,

                                        Petitioner,

                v.                                              9:08-cv-0150 (LEK)

WARDEN, Superintendent,

                                        Respondent.

_____

**APPEARANCES**                          **OF COUNSEL:**

**For the Petitioner:**

VERGIL MCBEAN
A044750913
Buffalo Federal Detention Center
4250 Federal Drive
Batavia, NY 14020
*Pro Se*

**For the Respondent**:

HON. ANDREW M. CUOMO                    THOMAS B. LITSKY, ESQUIRE
Office of the Attorney General          Ass't Attorney General
120 Broadway
New York, NY 10271

LAWRENCE E. KAHN, U.S. DISTRICT JUDGE


**DECISION AND ORDER**

## I.      INTRODUCTION

        Petitioner Vergil McBean was convicted on March 14, 2003 of three counts of third

degree criminal sale of a controlled substance (N.Y. PENAL LAW § 220.29(1)) after a jury trial in

Tompkins County and was sentenced on May 5, 2003 to serve three concurrent indeterminate

terms of two to six years in prison.  Pet. at 1 (Dkt. No. 1); Resp't Mem. of Law ("Resp't Mem.")

at 1 (Dkt. No. 8).[1]

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the following grounds: (1) he was denied due process by the prosecutor's failure to disclose an exculpatory police report prior to trial; (2) the prosecutor engaged in misconduct during cross-examination and in summation; (3) the trial court improperly denied his request for a missing witness charge; (4) the trial court improperly permitted hearsay testimony in violation of the Confrontation Clause; and (5) the trial court improperly refused to hold an evidentiary hearing on his motion to vacate his conviction filed pursuant to New York's Criminal Procedure Law ("CPL") §440.10.

---

[1] In an earlier Order, the Court expressed concern regarding whether Petitioner's apparent immigration detention affected this Court's jurisdiction over his habeas petition.  Feb. 29, 2008 Order at 1 n.1 (Dkt. No. 2) (citing Ogunwomoju v. United States, 512 F.3d 69 (2d Cir. 2008), which held that a habeas petitioner in immigration detention resulting from a removal order issued due to a criminal conviction that has *expired* is not "in custody" for purposes of establishing jurisdiction to consider habeas petitions brought under section 2254 challenging the state court conviction.  Id. at 74-75 (emphasis added)).

According to Respondent and the New York State Department of Correctional Services website, Petitioner was released to parole supervision on December 11, 2007.  Resp't Mem. at 1; http://nysdocslookup.docs.state.ny.us.  The maximum expiration date for his sentence is March 17, 2009.  Id.  Petitioner filed this petition on February 8, 2008, while on parole.  Petitioner is therefore "in custody" pursuant to the state conviction he challenges because he was on parole when he filed the petition and that sentence has not yet expired.  See Mitchell v. People of New York, 2007 WL 3355550, at *5 (S.D.N.Y. Sept. 12, 2007) (stating that "probation or parole qualifies as 'in custody' " for purposes of section 2254, and finding that since petitioner "filed his petition while on parole, he was 'in custody' and satisfies [the requirement of custody under section 2254]") (citing Eisemann v. Herbert, 401 F.3d 102, 105 n. 1 (2d Cir. 2005) and Jones v. Cunningham, 371 U.S. 236, 243 (1963)), adopted 2007 WL 3340832 (S.D.N.Y. Nov. 6, 2007); Chattley v. Brown, 2007 WL 4377686, at *1 (W.D.N.Y. Dec. 12, 2007) (stating that physical confinement "is not necessary in order for a prisoner to challenge his sentence[.]") (citing Jones, 371 U.S. at 241-43 (finding petitioner released on condition of parole was, for habeas purposes, "in custody" under his unexpired sentence)).

<u>See</u> Pet. at 6-16 and attached pages.  For the reasons that follow, the petition is denied.[2]


## II.      BACKGROUND

### A.      Facts

According to the state court records, Petitioner and a co-conspirator, Joan Chandler, sold

cocaine to undercover State Police Investigator David Fendick on December 4 and 18, 2001, and

January 11, 2002 in the City of Ithaca, New York.  People's Brief at 1 (Dkt. No. 7, Attach. 7);

Resp't Mem. at 2.

 On December 4, 2001, Fendick met with Investigator Andrew Navarro of the Ithaca

Police Department.  March 2003 Trial Tr. at 53-55, 114, 151-53 ("Trial Tr.") (Dkt. No. 7, Attach

11 and 12).  Navarro showed Fendick a photo array, which included Petitioner's photo, in an

effort to identify the person who sold drugs to Fendick on November 20, 2001.  <u>Id</u>; <u>see</u> Dkt. No.

7, Exhibit A at R157.[3]  When Fendick could not identify anyone, Navarro pointed to Petitioner's

photo and identified him by name as a basis for future investigations.  <u>Id.</u> at R157-58.

Later that day, Fendick met Chandler at a convenience store and told her he wanted to buy

crack cocaine.  Trial Tr. at 57-58.  Chandler told Fendick to meet her at home, where they further

---

[2] On December 5, 2008, Petitioner filed a Traverse (Dkt. No. 9) with the Court.  In addition to reiterating points made in his Petition, Petitioner also asked the Court "to check for a <u>Allen v. United States</u>, 164 U.S. 492 [1896] . . . violation before I got convicted."  Traverse at 2. The Court notes that the Petitioner did not raise this issue in his Petition or serve the Traverse upon the Respondent.  Moreover, Petitioner's Traverse fails to raise any specific allegations regarding an <u>Allen</u> violation, nor does the record reveal any indication of an impermissible <u>Allen</u> charge in the trial court's instructions to the jury.  <u>See</u> March 2003 Trial Tr. at 545-75. Therefore, this claim is denied.

[3] The letter "R" followed by a number refer to the pages written in the top right hand corner of the pages of the Record on Appeal.

discussed buying cocaine. Id. at 58. Chandler and Fendick drove together in Fendick's undercover police vehicle to a laundromat in downtown Ithaca. During the drive, Chandler made a telephone call and told Fendick that she was "calling Vergil" to "get the stuff." Id. at 59. At the laundromat, Fendick watched as Chandler took money from an individual known to Fendick as Dave, driving a blue pickup truck. Chandler then returned to Fendick's car and told him that "Dave wanted to get some too." Id. at 60-61. Fendick gave Chandler $100 to buy the cocaine, and an additional $20 for arranging the purchase. Id. at 66. Chandler paged Petitioner and when he returned her call, she told him she had two customers and needed "a hundred for one and the rest for the other." Id. at 62. Chandler told Fendick to drive to the Fall Creek Theaters. Id.

When they arrived at the theaters, Fendick observed a gray Dodge or Chrysler bearing New York license plate CR482U drive up to meet them. Trial Tr. at 63-64, 155-56. In December 2001, that vehicle was owned by Patricia McBean, Petitioner's mother.[4] The driver was a black male with dredlocks to his shoulders, a thin face and build, who was wearing a dark jacket. Fendick recognized Petitioner from the photo that Navarro had shown him, and identified Petitioner as the driver at trial. Id. at 64-65. Although Fendick watched Chandler and Petitioner exchange items, he could not see exactly what was being exchanged. Id. at 65.

Chandler returned to Fendick. She no longer had money but instead had "four pieces of drugs" that consisted of two larger pieces, known in street terminology as "50s" and two smaller pieces that Fendick called "bumpies." Trial Tr. at 67. Chandler gave Fendick the two larger pieces. Id. at 67-68. He drove Chandler back to the laundromat, dropped her off, and left the

---

[4] At the time of Petitioner's trial, the registered owner of the Chrysler was Vergil A. McBean. Trial Tr. at 156-57.

area.  Fendick turned the pieces over to Investigator Navarro.  Id. at 69.  A police chemist

determined that the pieces were cocaine.  Id. at 266-97.

On December 18, 2001, Fendick again contacted Chandler to purchase cocaine.  He drove

to Chandler's apartment and told her he wanted a "hundred."  Trial Tr. at 70.  Chandler stated

that she was "going to make a call to Vergil" and proceeded to make a telephone call.  Id. at 71.

Chandler then told Fendick that Vergil would meet them at the Fall Creek Theaters.  Id.  Fendick

gave Chandler $100 for the cocaine and an additional $20 for arranging the sale.  Id. at 75.  When

Fendick and Chandler arrived at the theater, Fendick saw the same gray Chrysler with license

plate CR482U he had seen at the December 4 drug transaction.  The car was parked on a side

street.  Id. at 72.  Fendick was "a hundred percent sure" that it was Petitioner in the car.  Id. at 73.

Fendick also saw the person known as Dave near a blue pick up truck in the parking lot.

Chandler approached and entered the passenger side of Petitioner's car, and they drove around

the block.  Trial Tr. at 73-74.  Approximately two minutes later, Chandler and Petitioner returned

to the theater and Chandler exited the car.  She approached Dave and dropped something into

Dave's hand.  Id. at 74.  Chandler then returned to Fendick and gave him two knotted pieces of

plastic wrap containing a substance.  Id. at 75-76.  Fendick turned the substance over to

Investigator Navarro, and a police chemist determined that the substance was cocaine.  Id. at 76,

165-66, 266-97.

Investigator William Barker, Jr. of the Ithaca Police Department, and Investigator Philip

Juran of the Community Narcotics Team, were assigned to conduct surveillance of the December

18 transaction.  Trial Tr. at 225, 240.  They followed Fendick's car from Chandler's apartment to

the theater parking lot.  Id. at 225-26.  As they approached the lot, Barker saw a gray Chrysler

bearing plate number CR482U.  The car passed Barker's vehicle, and Barker was "absolutely positive" that the driver was Petitioner.  Id. at 233.  Barker testified that once the transaction was completed, he attempted to follow Petitioner to obtain an address for a search warrant application.  Id. at 236.  Barker's car passed the parking lot entrance and Petitioner's car as he was waiting to exit the lot.  Barker was again certain that Petitioner was the driver.  Id. at 237-38.  Petitioner pulled out of the parking lot behind Barker's car, and Barker eventually lost sight of him.  Id. at 238-39.  Investigator Navarro recorded two identifications of Petitioner by Barker at 12:21 p.m. and 12:26 p.m.  Id. at 192, 195, 246-47.

Barker was familiar with Petitioner prior to December 18.  He had seen Petitioner "over 75 times" and had been present for between four and five face-to-face conversations with Petitioner.  Trial Tr. at 228-29.  Barker saw Petitioner on December 12, 2001 when he was conducting surveillance in an unrelated case in the housing projects on Madison Street.  Id. at 229.  On that date, Barker was located in a second floor apartment area used as a neighborhood police office.  Id.  He saw Petitioner in the same gray car he was driving in December 12, 2001 traveling on Madison Street, and Petitioner passed directly by Barker within fifty feet.  Id. at 229-30.  Since Barker believed that Petitioner's license was suspended, he radioed to Officer Debra Lawrence and her partner, Officer Clifford Ducey, to stop Petitioner.  Id. at 231-33.

Officer Lawrence stopped the gray Chrysler and asked its occupant for his license, registration and insurance information.  Trial Tr. at 233.  The documents revealed that the driver was Petitioner.  Id. at 254.  Lawrence confirmed that Petitioner's license was suspended and issued a ticket.  Id. at 255.  After Petitioner consented, a canine unit searched his vehicle for drugs with negative results.  Id. at 256.

-6-

On January 11, 2002, Fendick contacted Chandler for the final narcotics transaction.  She instructed him to meet her at the Fall Creek Theaters.  Trial Tr. at 76-78.  When Fendick arrived, he told Chandler he wanted "to get an eight ball" and asked whether it would cost $200.  Id. at 79-80.  Chandler told Fendick she had already spoken to Vergil, and that she was supposed to contact him once Fendick was at the theater.  Id.  Chandler asked Fendick to drive around the block to avoid sitting in the parking lot for any length of time.  Id. at 80.  Fendick complied, and when he returned, he parked on the street.  Chandler made a call from a pay phone, and shortly thereafter Petitioner arrived and parked in front of Fendick.  Id.  This time, there were two people in the gray Chrysler.  Petitioner was in the driver's seat, and an unidentified black male was in the front passenger seat.  Id. at 81.  Fendick gave Chandler $200 for the cocaine and an additional $20 for arranging the sale.  Id. at 83.  Chandler got into the back passenger seat of Petitioner's car, and appeared to be speaking to Petitioner.  The front passenger faced forward and did not appear to move throughout the time Chandler was in the vehicle.  Id. at 81-83.  Fendick could see most of Petitioner's face, and he watched as Petitioner's and Chandler's hands were moving in what appeared to be an exchange of items.  Id. at 82.  Chandler returned to Fendick's car and gave him one knotted piece of plastic wrap containing a substance.  Id. at 83-84.  Fendick drove Chandler to a nearby bar, and then turned the substance over to Investigator Navarro.  Id. at 84-85.  A police chemist determined that the substance was cocaine.  Id. at 266-97.

On July 24, 2002, a Tompkins County grand jury returned a six-count indictment charging Petitioner with three counts of third degree criminal sale of a controlled substance and three counts of third degree criminal possession of a controlled substance.  Dkt. No. 7, Ex. A at R6-7.  Chandler was also charged with the sale and possession of a controlled substance and

conspiracy.  She entered a guilty plea to three counts of third degree criminal sale of a controlled substance and three counts of conspiracy in connection with the transactions charged in Petitioner's indictment.  See Dkt. No. 7, Ex. A at R98-99; B at R252, 265, 270-72 (Plea Transcript, Chandler, Sept. 16, 2002).  She was not required to cooperate against Petitioner in exchange for the plea, and did not testify at Petitioner's trial.  Through counsel, Chandler invoked her Fifth Amendment privilege against self-incrimination, explaining that she feared federal prosecution.  Dkt. No. 7, Ex. B, at R198; Trial Tr. at 21-22.  She was declared an unavailable witness on that basis without objection from either the prosecutor or defense counsel. Id.

Petitioner's first two jury trials ended with the juries being deadlocked and mistrials declared on November 22, 2002 and January 17, 2003.  The third trial began on March 10, 2003. As he had done with the two previous trials, Petitioner testified on his own behalf.  Petitioner admitted that in December 2001 and January 2002, he occasionally drove the gray Chrysler with plate number CR482U, that it was owned by his parents, and that he let friends and family drive the car.  Trial Tr. at 442-43.  Petitioner claimed that he let "a lot of friends with dredlocks" drive the car when they were in Ithaca.  Id. at 442-45.  He claimed that he did not know who was driving the car on the dates of the drug sales.  Id. at 438-39, 465-66.  Petitioner had dredlocks during the time frame of the drug sales.  Id. at 463.

Petitioner admitted he knew Chandler because they previously lived in the same city building, but denied that he was friends with her or that they socialized.  Trial Tr. at 437-39, 463-64.  He denied selling cocaine to Chandler on any of the dates in question, and claimed that on all three days he was in Binghamton, New York and not Ithaca.  Trial Tr. at 427-29, 445-47, 460-61.

Petitioner called several witnesses on his behalf.  Michelle Smith, Petitioner's girlfriend, testified that she lived with Petitioner in her apartment in Binghamton.  Trial Tr. at 379-80. Petitioner normally stayed at Smith's apartment Sundays through Wednesdays, and then was traveling to promote his DJ business.  Id. at 381-82.  She testified that their income varied and that they received financial assistance from others, and were behind on their bills in December 2001 and January 2002.  Id. at 382, 401.  According to Smith, Petitioner was home on January 11, 2002 because it was his mother's birthday and he did not go to her party, which was held in Ithaca.  Although December 4 and 18 were Tuesdays, there was nothing otherwise noteworthy about these dates.  Id. at 388-90, 394-97.  Smith testified that on December 4 and 18, she and Petitioner were home alone.  Id. at 390-91.  It was not until several months after the crimes that Smith determined that she was with Petitioner on the dates alleged in the indictment.  Id.

Emmanuel McBean, Petitioner's father, testified that Petitioner was not at his mother's party on January 11, 2002, but that he did not know where Petitioner or the gray Chrysler were on that day.  Trial Tr. at 319, 334-36.  He further testified that other family members had access to the gray Chrysler, and that there were either four or five sets of keys to the car.  Id. at 320.  He testified that in December 2001, Petitioner purchased the car from him and made payments to him.  When Petitioner failed to make the payments, Mr. McBean took the car from him.  Id. at 322-23.

Petula McBean, Petitioner's sister, also testified that she did not see Petitioner at their mother's party on January 11, 2002.  Trial Tr. at 407-08.  Although she testified that the ceiling in the Chrysler sagged to the point where it obstructed the view out the back window, she continued to drive the car, using side mirrors.  Id. at 416.  Petula McBean testified that her

cousins also drove the car, including Rollie, Junior, Sherwin, and Steven, all black males with short hair.  Id. at 423-25.

On March 13, 2003, the jury convicted Petitioner on all three counts of criminal sale of a controlled substance.  Trial Tr. at 361, 576-78.[5]

**B.      State Court Proceedings**

On April 14, 2003, McBean's attorney moved to set aside the verdict pursuant to CPL § 330.30(1).  Dkt. No. 7, Ex. B, at R220-36.  Counsel first argued that the District Attorney's Office failed to disclose that Sherwin McBean, Petitioner's cousin, was arrested by Ithaca police on January 2, 2002 for criminal possession of a controlled substance and driving with a suspended license while driving the gray Chrysler.  See Dkt. No. 7, Ex. B at R223-27.  When he was arrested, Sherwin McBean was in possession of crack cocaine and told police he sold it to earn extra money.  Id. at R224.  According to Petitioner's attorney, the prosecutor was obligated to disclose this information because it constituted Rosario[6] and Brady[7] material.  Id at R225-27.  Counsel also argued that prosecutor engaged in misconduct during the cross-examination of witnesses and in summation when, despite this information, he argued that no one but McBean could have been driving the gray Chrysler and selling cocaine.  Id. at R227-28.

Counsel further argued that the prosecutor committed a Brady violation because he failed

---

[5] The three counts of the indictment charging McBean with third degree criminal possession of a controlled substance were not submitted to the jury because the trial court found that "[t]he elements are already included in the [charges of] of Criminal Sale of a Controlled Substance in the Third Degree."  Trial Tr. at 554.  See Trial Tr. at 469; Resp't Mem. at 8.

[6] People v. Rosario, 9 N.Y.2d 286 (1961).

[7] Brady v. Maryland, 373 U.S. 83 (1963).

to disclose a statement by Chandler that she had no memory of "Virgil McBean being in a gray car during January 2002 or December 2001 during any drug transactions" or that he gave her any drugs on "the dates stated." Dkt. No. 7, Ex. B at R228-29, 244. Counsel also argued that this statement by Chandler constituted new evidence. Id. at R229-30.

Counsel also asserted that there was additional newly discovered evidence that impacted upon the verdict, including a statement by Heather McEver that provided an additional alibi for Petitioner and a statement by Balinda McCoy that incriminated her and provided exculpatory evidence for Petitioner. Dkt. No. 7, Ex. B at R230-33. Finally counsel asserted that the trial court should have given a missing witness jury instruction for Chandler, and that the trial court erred when it admitted Chandler's hearsay statements at trial. Id. at R233-34.

On April 17, 2003, counsel submitted an additional ground in support of his motion to set aside the verdict. Counsel argued that Investigator Navarro gave false and misleading testimony that the police department did not have the means to gather photographs or video of the undercover drug transactions. According to counsel, Navarro took photographs in an unrelated case in February 2003. Id. at R277-78.

The District Attorney opposed the motion on May 1, 2003. Dkt. No. 7, Ex. B at R339-47. On May 5, 2003, the trial court stated that it reviewed Petitioner's motion and the response by the People, but that it did "not find a sufficient basis to set aside this verdict in the application before this Court[.]" and denied the motion. Sentencing Tr., 5/5/03, at 2. Petitioner was sentenced to three concurrent indeterminate terms having a minimum of two years and a maximum of six years in prison. Id. at 10.

Petitioner filed a Notice of Appeal on May 7, 2003. See Dkt. No. 7, Ex. F, Appellate

-11-

Brief, at Appendix ("A") 1.  Before his appeal was perfected, Petitioner filed a motion to vacate

his conviction pursuant to CPL § 440.10 on December 16, 2004.  Dkt. No. 7, Ex. B at R368-416;

Ex. C at R416-650; Ex. D at R651-899.  In the motion, counsel raised the same grounds he raised

in his section 330.30 motion.  Id.  The prosecutor opposed the motion in an affidavit dated

February 15, 2005.  Dkt. No. 7, Ex. E, at R901-16.

In a Memorandum Decision and Order dated February 15, 2005, the trial court denied the

section 440 motion.  Dkt. No. 7, Ex. E, at R917-18.  The court read Petitioner's motion to raise

the following grounds: (1) the prosecutor's late production of a January 2, 2002 police report

constituted Rosario and Brady violations; (2) Chandler's statement was improperly received into

evidence; and (3) Chandler's statement, and statements made by others, constituted newly

discovered evidence.  Id. at R917.  The court concluded that there was no "reasonable possibility

that the failure to provide earlier disclosure of the January 2nd police report materially

contributed to the result of the trial," citing CPL § 240.75.  Id. at R918.  The court further found

that the statements and affidavits Petitioner produced did not constitute evidence that "could not

have been produced by the defendant at the trial even with due diligence on his part" and that the

statements did not constitute newly discovered evidence within the meaning of section

440.10(1)(g).  Id.  Finally, the court found that Chandler's statement, admitted at trial, was not

the type of " 'testimonial' " hearsay that has been rendered inadmissible under the ruling in

Crawford v. Washington."  The court denied the section 440 motion in its entirety without

granting an evidentiary hearing.  Id.

Petitioner, through his counsel, sought permission to appeal the denial of his section 440

motion in the Appellate Division, Third Department.  Dkt. No. 7, Ex. E, at R920-27.  He also

sought to have that appeal consolidated with his direct appeal.  Id.  The prosecutor took no

position regarding Petitioner's requests.  Id. at R928.  In an Order dated August 4, 2005, the

Appellate Division granted Petitioner permission to appeal the denial of his section 440 motion

and consolidated the appeals.  Id. at R929.

      In his consolidated appeal, Petitioner argued that: (1) the prosecutor committed Rosario

and Brady violations by failing to provide a required police report prepared by investigator

Barker regarding Sherwin McBean's arrest; (2) the prosecutor engaged in misconduct during

cross-examination and summation when he used the withheld police report to bolster

Investigator Barker's identification of Petitioner, and when he told the jury that no one but

Petitioner could have been in the gray Chrysler on the dates of the drug transactions; (3) the trial

court erred when it refused a missing witness charge relating to Chandler, and when it permitted

hearsay statements made by Chandler to be admitted into evidence at trial in violation of his right

to confront witnesses against him; and (4) the trial court improperly denied his section 440

motion without holding an evidentiary hearing.  Dkt. No.7, Ex. F, at 1-50.  The prosecutor

opposed that appeal.  Dkt. No. 7, Ex. G.

      On August 3, 2006, the Appellate Division affirmed Petitioner's conviction and the denial

of his section 440 motion.  Dkt. No. 7, Ex. H; People v. McBean, 32 A.D.3d 549 (3d Dept.

2006).  The court found that any Rosario error in failing to disclose Investigator Barker's January

2, 2002 report was harmless because there were no "meaningful inconsistencies" and the report

actually "confirms Barker's ability to distinguish between defendant and [Sherwin] McBean."

Id. at 551. The court further ruled that there was no Brady violation.  Since the report established

that Barker could distinguish Petitioner from his cousin, the contents of the report were not

"exculpatory or material," and the result of the trial would not have changed had the report been disclosed.  Id.

The Appellate Division also rejected Petitioner's argument that his right to confront witnesses under Crawford was violated when the trial court permitted Chandler's statement to be admitted into evidence.  The court stated that Chandler was not aware that Investigator Fendick was an undercover agent when she made the statements, and thus, the statements "lacked the formality of testimony and were not made in anticipation of prosecution."  McBean, 32 A.D.3d at 551-52.

Finally, the court rejected Petitioner's claim that the county court improperly denied the section 440 motion because each item of evidence Petitioner claimed to be newly discovered "merely impeached former evidence or was cumulative of prior testimony," and Petitioner "failed to establish that such evidence could not have been discovered prior to trial with due diligence." Id. at 552.  On December 11, 2006, the New York Court of Appeals denied Petitioner's application for leave to appeal.  Dkt. No. 7, Ex. J; People v. McBean, 7 N.Y.3d 927 (2006).

**C.      Proceedings in This Court**

Petitioner filed a petition for a writ of habeas corpus on February 8, 2008.  See Dkt. No. 1.  On September 29, 2008, the Office of the Attorney General for the State of New York, acting on Respondent's behalf, filed a response and memorandum of law in opposition to the petition, along with the relevant state court records.  See Dkt. Nos. 6-8.

**III.     DISCUSSION**

**A.      Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication of the claim: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied 127 S. Ct. 1267 (2007); DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005) (citing 28 U.S.C. § 2254(d)).  AEDPA also requires that in any such proceeding "a determination of a factual issue made by a State court shall be presumed to be correct [and][t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see also DeBerry, 403 F.3d at 66; Boyette v. LeFevre, 246 F.3d 76, 88 (2d Cir. 2001).

A state court decision violates the "contrary to" clause of section 2254(d)(1) when it "reaches a result opposite to the one reached by the Supreme Court on the same question of law or arrives at a result opposite to the one reached by the Supreme Court on a 'materially indistinguishable' set of facts."  Earley v. Murray, 451 F.3d 71, 74 (2d Cir. 2006) (citing Williams, 529 U.S. at 405-06).  A federal habeas court may only grant the writ under the "unreasonable application" clause of the section when the state court's decision "identifies the correct rule of law but applies that principle to the facts of the petitioner's case in an unreasonable way."  Earley, 451 F.3d at 74 (citing Williams, 529 U.S. at 413).  A federal court engaged in habeas review is not charged with determining whether the state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively

-15-

unreasonable." Williams, 529 U.S. at 409; see also Sellan v. Kuhlman, 261 F.3d 303, 315 (2d

Cir. 2001). Objectively unreasonable means " 'some increment of incorrectness beyond error' "

is required in order to grant a federal habeas application. Earley, 451 F.3d at 74 (quoting Francis

S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).

**B.      Rosario and Brady Violations**

Petitioner alleges in Ground One of his petition, as he did in state court, that the

prosecutor's failure to disclose the police report prepared by Investigator Barker pertaining to the

January 2, 2002 arrest of Sherwin McBean constituted Rosario and Brady violations. Petitioner

argues the report is exculpatory because: (1) it contains inconsistencies regarding Investigator

Barker's surveillance location on December 12, 2001 that would impeach Barker's credibility;

and (2) the report contains information pertaining to Sherwin McBean's arrest for possession of

crack cocaine while driving Petitioner's gray Chrysler, and statements he made about selling

cocaine, that would have been helpful to the defense. Pet. at Ground One and attached pages.

The Appellate Division rejected these arguments, finding that there were no "meaningful

inconsistencies" between the report and Barker's testimony regarding the December 12, 2001

stop of Petitioner. McBean, 32 A.D.3d at 551. It further rejected Petitioner's claim that

Sherwin's statements that he sometimes sold drugs would have supported Petitioner's defense

that the police misidentified Petitioner as the drug seller because the report confirmed Barker's

ability to distinguish between Petitioner and Sherwin. Id. Those findings, which are supported

by the record, were not contrary to or an unreasonable application of clearly established Supreme

Court precedent.

**1.      Barker's Report and Trial Testimony**

Petitioner's claim centers around a January 2, 2002 report prepared by Investigator

Barker.  According to the report (Dkt. No. 7, Ex. C. at R352-55), Investigator Barker was on

patrol when he spotted the gray Chrysler bearing plate number CR482U, which he knew

belonged to Petitioner.  He explained that he saw the same vehicle a few weeks earlier being

operated by Petitioner, and at that time Petitioner had a suspended license.  After a traffic stop

conducted by Officer Lawrence, Petitioner was arrested for driving with a suspended license.

See id. at R352.  Barker stated that as Petitioner was being taken into custody, a black male

approached Officer Lawrence and asked for information on Petitioner.  Officer Lawrence advised

the male that Petitioner was being arrested, and that his vehicle needed to be moved by a licensed

driver.  The male told Lawrence he did not have a license, and left the location, walking "directly

by [Barker] as I was parked along Madison St[reet]."  This male was the person operating

Petitioner's car on January 2, 2002.  Id. at R352.

The report further indicates that on January 2, 2002, Barker and his partner followed the

gray car, which traveled to the 600 block of Hancock Street.  The male got out of the car as

Barker and his partner arrived.  Barker saw the male lift up his jacket and push an unknown

object into his inner pants area with his left hand.  Id. at R352.  Barker asked the male to remove

his hands from his pants and meet the officers "along the sidewalk area."  Id.  The male turned to

Petitioner, who came out of a nearby apartment, and exchanged an unknown object with

Petitioner.  Petitioner returned to his apartment.  Id. at R353.  Barker asked the male for his

license, and he responded that he did not have it with him.  When Barker confronted him about

having seen him a few weeks earlier, and with the knowledge that the male then stated he did not

have a license, the male confirmed that he did not have a license.  He identified himself as

-17-

Sherwin Oswald McBean.  Id. at R353.

Barker arrested Sherwin McBean after learning that his license was suspended "with six (6) scoffs."  Id. at R353.  During the patdown search, Sherwin admitted that he possessed crack cocaine, but that it was loose and not packaged.  Id. at R354.  Barker eventually recovered three small packets from Sherwin's right coat pocket that tested positive for the presence of cocaine. Id. at R354-55.  Sherwin was arrested for driving with a suspended license ("AUO 3rd") and possession of a controlled substance ("CPCS 7th").  When Barker asked Sherwin if he sold cocaine, Sherwin replied, "not a lot, just so I can have extra money."  Id. at R354.

At trial, Barker testified that on December 12, 2001, "he was conducting surveillance within the housing projects on Madison Street."  Trial Tr. at 229.  Barker was positioned in the "neighborhood police office" located in a second floor apartment.  Id.  He saw Petitioner's vehicle traveling west on Madison Street, passing directly by him from a distance of approximately fifty feet.  Id. at 230.  Barker requested that Officer Lawrence and her partner stop Petitioner because he thought Petitioner had a suspended license.  Id. at 231.  Barker watched through binoculars from the second story window as Petitioner was stopped, and he made a positive identification at that time.  Id. at 232-33.  Barker did not testify concerning Sherwin McBean's presence at the scene.

### 2.     Petitioner's Rosario Claims Are Not Cognizable

Petitioner's claims that the prosecutor committed a Rosario violation by not turning over the January Barker report does not form a basis for federal habeas relief because these claims derive from state law.  See Moss v. Phillips, 2008 WL 2080553, at *7 (N.D.N.Y. May 15, 2008) (Kahn, D.J.); Scheckells v. Cunningham, 2007 WL 1428472, at *4 (N.D.N.Y. May 11, 2007)

-18-

(Kahn, D.J., adopting Report-Recommendation of Peebles, M.J.).  Petitioner's <u>Rosario</u> claims are therefore dismissed.

### 3.      Petitioner's <u>Brady</u> Claims Lack Merit

A petitioner may be entitled to habeas relief if he shows that the government violated his right to due process by failing to turn over "material exculpatory evidence" before trial.  <u>Strickler</u> <u>v. Greene</u>, 527 U.S. 263 (1999); <u>Giglio v. United States</u>, 405 U.S. 150, 153-54 (1972); <u>Brady v.</u> <u>Maryland</u>, 373 U.S. 83 (1963).  To demonstrate a <u>Brady</u> violation, Petitioner must show that: (1) the evidence was favorable to the accused; (2) the evidence was suppressed by the prosecutor; and (3) prejudice resulted.  <u>Strickler</u>, 527 U.S. at 281-82; <u>Moss,</u> 2008 WL 2080553, at *8.  A habeas petitioner must satisfy all three elements to prevail on a <u>Brady</u> claim.  <u>Scheckells</u>, 2007 WL 1428472, at *6 (citing <u>Hughes v. Phillips</u>, 457 F. Supp. 2d 343, 359 (S.D.N.Y. 2006) (citing <u>Leka v. Portuondo</u>, 257 F.3d 89 (2d Cir. 2001)).

Evidence is favorable to the defense when it is exculpatory (relating to the factual innocence of the defendant) or when it serves to impeach the government's witnesses.  <u>Strickler</u>, 527 U.S. at 280; <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985).  Evidence is considered "material" where there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Strickler</u>, 527 U.S. at 280 (quoting <u>Bagley</u>, 473 U.S. at 682).  Impeachment evidence may be material where the witness supplied the only evidence that linked a defendant to the crime at issue, or where the witness supplied the only support for an essential element of the crime.  <u>DeChirico v. Walker</u>, 558 F. Supp. 2d 355, 371-72 (E.D.N.Y. 2008); <u>see</u> <u>Boyette</u>, 246 F.3d at 93 (undisclosed impeachment evidence material in one-witness identification case); <u>United States v. Avellino</u>, 136 F.3d 249,

256-57 (2d Cir. 1998) (impeachment evidence considered material where witness supplied only evidence linking defendant to crime or where witness supplied only evidence of essential element of offense).

Petitioner's first complaint is that the report constitutes exculpatory impeachment material because it contains inconsistencies regarding Investigator Barker's surveillance location on December 12, 2001 that would impeach Barker's credibility.  While it appears clear that Barker's report was not turned over to Petitioner's counsel until after trial, the report is not material impeachment evidence. As the Appellate Division found, there are "no meaningful inconsistencies" between the report and Barker's testimony.  McBean, 32 A.D.3d at 551.  The report places Barker "on patrol" on December 12, 2001, and his testimony places him conducting surveillance inside a building on that date, but both the report and Barker's testimony place Petitioner in the vicinity of Madison Street driving the gray Chrysler on that date.  Dkt. No. 7, Ex. C at R352; Trial Tr. at 229-31.  Barker's identification of Petitioner on December 12, 2001 was confirmed by Officer Lawrence, who stopped Petitioner at Barker's request.  Dkt. No. 7, Ex. C at R352; Trial Tr. at 252-57.  Importantly, Barker did not testify regarding the events that took place on December 12, 2001 after he positively identified Petitioner.  Thus, Barker's trial testimony was not inconsistent with those portions of the January 2 report that detail the events that took place after he confirmed Petitioner's identity, including Sherwin McBean's presence at the location.

As the Appellate Division further found, the report and Barker's trial testimony establish that Barker was able to recognize and identify Petitioner, and distinguish between Petitioner and Sherwin McBean.  McBean, 32 A.D.3d at 551.  In fact, Barker's identification of Petitioner on

December 12, 2001 was not the sole basis for his identification of Petitioner on December 18, 2001.  Barker testified that before December 18, 2001, he was familiar with Petitioner and had seen him "over 75 times."  Trial Tr. at 228.  Before December 18, 2001, Barker had been present for face-to-face conversations with Petitioner between five and ten times.  Id. at 229.  This testimony established that Barker could identify Petitioner even without having seen him at all on December 12, 2001.

Moreover, Barker did not provide the only evidence that linked Petitioner to the December 18, 2001 drug transaction.  Investigator Fendick testified that on December 18, 2001, he met with Chandler to purchase cocaine; Chandler told Fendick she was "going to make a call to Vergil;" Chandler then placed a telephone call, and Chandler told Fendick that Vergil would meet them in the Fall Creek Theater parking lot.  Trial Tr. at 70-71.  When Petitioner arrived alone in the gray Chrysler, Fendick immediately recognized Petitioner as the occupant of the car and was "a hundred percent sure" of his identity.  Id. at 73.  Chandler got into the passenger side of Petitioner's vehicle, and they drove around the block, returning approximately two minutes later.  Chandler brought Fendick two knotted pieces of what was ultimately determined to be crack cocaine.  Id. at 73-76.  Since Barker did not provide the only information that linked Petitioner to the December 18, 2001 drug sale, and he did not supply the only support for any essential element of the crime, the January 2 report was not material impeachment evidence.  See Boyette, 246 F.3d at 93; Avellino, 136 F.3d at 256-57; DeChirico, 558 F. Supp. 2d at 371-72.  Petitioner has not demonstrated that there is a "reasonable probability that the jury would have returned a different verdict" if the report had been disclosed and Barker questioned regarding the inconsistencies in his surveillance location on December 12, 2001.  Strickler, 527 U.S. at 296.

-21-

Petitioner's second challenge to Barker's January report is equally unavailing.  Petitioner asserts that Sherwin's arrest is exculpatory because it supported his theory that the police misidentified Petitioner as the drug seller.  Petitioner argues that the report shows that Sherwin's arrest took place during the general time frame of the drug transactions for which Petitioner was convicted, Sherwin was in possession of the same drug involved in Petitioner's transactions, he was driving the same gray Chrysler at issue, and he admitted to selling crack cocaine.  Pet. at Ground One and attached pages.  The report indeed shows that Sherwin was arrested for possessing crack cocaine on January 2, 2002.  Dkt. No. 7, Ex. C at R352-55.  But nothing in the report suggests that Sherwin McBean, and not Petitioner, was the person who sold cocaine to Chandler on the dates in question.

As the Appellate Division found, the report demonstrated Barker's ability to distinguish between Petitioner and Sherwin.  McBean, 32 A.D.3d at 551.  Petitioner's convictions stemmed from drug transactions that took place on December 4, 2001, December 18, 2001, and January 11, 2002 and not on December 12, 2001.  Chandler told Fendick each time that the person she was contacting was named "Vergil," and each time Fendick recognized the seller as Petitioner.  Trial Tr. at 58-65, 71-74, 79-84.  On the dates in question, including December 12, 2001, Petitioner had shoulder-length dredlocks.  Id. at 63-64, 82-83, 231, 254-55.  According to Petitioner's sister, Petula, Sherwin McBean had short hair.  Trial Tr. at 424-25.  The fact that Sherwin was driving the gray Chrysler may have been useful to establish that someone other than Petitioner drove the car, but Petitioner's counsel made that point at trial.  Emmanuel McBean, Petitioner's father, testified that family members other than Petitioner drove the car, and that there were four or five sets of keys.  Trial Tr. at 320-21, 23.  Petitioner's sister, Petula, testified

that she had seen Sherwin McBean drive the gray Chrysler.  Id. at 422.  Petitioner also testified

that several others drove the car.  Id. at 439.  He named several of those people, who also had

dredlocks, but Sherwin McBean was not one of them.  Id. at 442-47.  On this record, there is no

reasonable probability that the information regarding Sherwin's arrest would have changed the

result.  Strickler, 527 U.S. at 296.[8]

      In sum, the Appellate Division correctly found that the prosecutor's failure to disclose the

January Barker report did not amount to a Brady violation because its contents were not material

or exculpatory.  See, e.g. Livingston v. Herbert, 2002 WL 59383, at *3 (N.D.N.Y. Jan. 3, 2002)

(Kahn, D.J., adopting Report-Recommendation of Homer, M.J.) ("Absent . . . materiality, a

Brady violation does not require a reversal") (citation omitted).  Accordingly, Petitioner's Brady

claims are denied.

## C.    Prosecutor Misconduct

      Petitioner alleges in Ground Two of his petition, as he did on direct appeal, that the

prosecutor committed misconduct during cross-examination and during his summation because

he "falsely suggested" to the jury that no one but Petitioner was in the gray Chrysler on the dates

---

    [8] It is worth noting that "[e]vidence is not 'suppressed' if the defendant either knew, or
should have known, of the essential facts permitting him to take advantage of any exculpatory
evidence."  Lewis v. McGinnis, 2008 WL 833964, at *22 (N.D.N.Y. Mar. 27, 2008) (Kahn, D.J.,
adopting Report-Recommendation of DiBianco, M.J.) (quoting Leka v. Portuondo, 257 F.3d 89,
100 (2d Cir. 2001)); Toland v. Walsh, 2008 WL 65583, at *23 (N.D.N.Y. Jan. 4, 2008) (Sharpe,
D.J.), reconsideration denied 2008 WL 657247 (N.D.N.Y. Mar. 7, 2008).  The record suggests
that Petitioner knew, or should have known, that Sherwin was arrested on January 2, 2002 while
he was driving the gray Chrysler.  Petitioner was present when Sherwin was stopped, and so
testified at his first trial.  Dkt. No. 7, Ex. G., at RA39.  Petitioner had a brief opportunity to speak
with Sherwin and exchange an "unknown item" prior to Sherwin's arrest.  Dkt. No. 7, Ex. C, at
R352-53.  Counsel placed Sherwin on his witness list, and interviewed him regarding the arrest.
Dkt. No. 7, Ex. B, at R225.

of the drug sales despite his knowledge of the Barker January report regarding Sherwin McBean's use of the car.  Pet. at Ground Two.

    The Appellate Division's opinion is silent regarding Petitioner's claims of prosecutor misconduct.  McBean, 32 A.D.3d at 551-52.  The Court must therefore determine whether the claim has been adjudicated on the merits for purposes of AEDPA.  A state court adjudicates a prisoner's federal claim on the merits " 'when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.' "  Jimenez v. Walker, 458 F.3d 130, 140 (2d Cir. 2006) (quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).  When determining whether a disposition is on the merits, the Second Circuit has directed "habeas courts to look at the face of state-court opinion, whether the state court was aware of a procedural bar, and the practice of state courts have done in similar cases."  Norwood v. Artis, 487 F. Supp. 2d 321, 328 (W.D.N.Y. 2007) (citing Jimenez, 458 F.3d at 145 & n. 16).  The Appellate Division unquestionably reduced its disposition of Petitioner's appeal to judgment by affirming his conviction.  It is reasonable to assume that the Appellate Division was aware that the claims could be disposed of on procedural grounds because the People, in its brief in opposition to Petitioner's appeal, asserted that Petitioner "never objected to the comments during the prosecutor's summation."  Dkt. No. 7, Ex. G, at 21.  But the Court "need not become ensnared in the decidedly thorny issue of whether there was an adjudication on the merits under these circumstances" because, even under a pre-AEDPA de novo standard of review, Petitioner's claims lack merit.  Norwood, 487 F. Supp. 2d at 328 (citing Messiah v. Duncan, 435 F.3d 186, 197 (2d Cir. 2006)).

    A petitioner may obtain habeas relief based on a claim of prosecutorial misconduct during summation only if the misconduct "so infected the trial with unfairness as to make the

resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643

(1974)).  To meet his burden, Petitioner "must demonstrate that he suffered actual prejudice

because the prosecutor's comments during summation had a substantial and injurious effect or

influence in determining the jury's verdict." Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994).

Three factors are considered by a habeas court in determining whether a prosecutor's summation

created actual prejudice: " 'the severity of the misconduct; the measures adopted to cure the

misconduct; and the certainty of conviction absent the improper statements.' " Tankleff v.

Senkowski, 135 F.3d 235, 252 (2d Cir. 1998) (quoting Floyd v. Meachum, 907 F.2d 347, 355 (2d

Cir. 1990)).  The court "must evaluate the challenged remarks in the context of the trial as a

whole, for the government is allowed to respond to argument that impugns its integrity or the

integrity of its case." United States v. Rivera, 22 F.3d 430, 438 (2d Cir.1994); see Darden v.

Wainwright, 477 U.S. 168, 182 (1986) (finding no substantial prejudice, in part because "[m]uch

of the objectionable content was invited by or was responsive to the opening summation of the

defense") (citing United States v. Young, 470 U.S. 1, 13 (1985)).

    Petitioner first asserts that the prosecutor, through "cross-examination of witnesses, built

upon the withholding of the exculpatory evidence [the January Barker report], resulting in a

pattern of misconduct so severe" that it deprived him of a fair trial.  Pet. at 8 and attached pages.

Petitioner also states that the prosecutor made arguments during his cross-examination of

Petitioner that there was no one other than Petitioner who could have been driving the gray

Chrysler on the dates of the drug sales.  Id.  Petitioner has not, however, pointed to specific

portions of the record or set forth any facts that support his claim that the prosecutor engaged in

any misconduct during cross-examination.  Therefore, the portion of Petitioner's prosecutor

misconduct claim regarding cross-examination is too vague to state a basis for habeas relief, and it is dismissed.  See, e.g., Brown v. New York, 2006 WL 3085704, at *7 (E.D.N.Y. Oct. 30, 2006) (vague and conclusory allegations are insufficient to state a viable claim for habeas relief); Skeete v. New York, 2003 WL 22709079, at *2 (E.D.N.Y. Nov. 17, 2003) (same).

Petitioner also claims that the prosecutor engaged in misconduct during his closing argument.  His first claim is that the prosecutor improperly argued in summation that the only person who could have been driving the gray Chrysler on the dates of the drug sales was Petitioner, even though he was aware of McBean's stop and arrest while driving it.  Like his claim that the prosecutor improperly cross-examined him on this subject, Petitioner's claim is conclusory and unsupported by citations to the record.  See Skeete, 2003 WL 22709079, at *2.  To the extent that Petitioner is objecting to the portion of the prosecutor's summation in which he argues that Petitioner was the driver of the gray Chrysler and not any of his friends with deadlocks or his cousins with short hair (Trial Tr. at 543-44), that claim fails.  The prosecutor's comments were fair based upon the evidence, including positive identifications by Fendick that Petitioner was the person driving the gray Chrysler on the dates of the drug transactions, Petitioner's own testimony that both he and several of his friends with dredlocks drove the car, and that of his witnesses.  See Trial Tr. at 63-64, 72, 79-82, 320, 423-25, 442-45, 465-66.  Accordingly, Petitioner cannot show that he suffered prejudice as a result of these comments.  See Ogletree v. Graham, 559 F. Supp. 2d 250, 260 (N.D.N.Y. 2008) (Scullin, S.J., adopting Report and Recommendation of Bianchini, M.J.) ("statements during summation are permissible if they constitute a 'fair comment on the evidence' at trial and reasonable inference therefrom, or a 'fair response to remarks made by the defense counsel during summation.' ") (quoting Roman

-26-

v. Filion, 2005 WL 1383167, at *26 (S.D.N.Y. June 10, 2005)); Osorio v. Conway, 496 F. Supp.

2d 285, 301 (S.D.N.Y. 2007) (stating that statements in summation that are either a fair comment

on the evidence or a fair response to defense counsel's summation are permissible and do not

amount to prosecutor misconduct).

   Finally, Petitioner challenges three specific portions of the prosecutor's closing argument.

He argues that in each portion, the prosecutor capitalized on the alleged Brady violations

regarding Investigator Barker's December 12 identification of Petitioner, by using it to argue to

the jury that Barker's identification of Petitioner was reliable.  The portions of the summation to

which the Petitioner objects (in italics) are as follows:

     Eight days later, December 12, 2001, Investigator Barker, conducting surveillance
in the City of Ithaca, on an unrelated case.  He knows the Defendant, he knows
him well, he admits he has seen him about 75 times in the past.

     On this particular day he was conducting a surveillance from a second story
window.  The Defendant drives by, driving the same Chrysler vehicle, displaying
the same plate number.  From the second story window, Investigator Barker
recognizes the Defendant from approximately 50 feet away, Ladies and
Gentlemen.  Knowing that the Defendant has a suspended license, he radios to
officer Lawrence and says, "Could you please stop Vergil McBean.  He has a
suspended license."

     Officer Lawrence responds to the general vicinity, stops the Defendant, and what
does he get out of this, more than anything else, not the fact that the Defendant has
a suspended license, if he did at all, but the fact that his identity was confirmed by
officer Lawrence.

     *Why is that important? Because it shows you, Ladies and Gentlemen, how well
Investigator Barker knows the Defendant.  He is so familiar with the Defendant
that he can recognize him from 50 feet away, in a second story window, as the
Defendant drives by, Ladies and Gentlemen.* That's how familiar Investigator
Barker is with the Defendant.  That's how strong his identifications are.

Trial Tr. at 521.

     Remember, this isn't like you or me sitting up in a second story window, looking

-27-

out.  This is a trained narcotics investigator.  This is what he does.  He conducts surveillance.  He is in the business of watching people, Ladies and Gentlemen, watching drug deals, watching crack houses, as he put it, Ladies and Gentlemen.  That's what he does.  He's obviously very good at it.  *He had no problem picking the Defendant out on December 12th, 2001.  He demonstrated for you his ability on the stand to ID the Defendant.*

Trial Tr. at 521-22.

December 18th is important, Ladies and Gentlemen, obviously, because this is the day that Investigator Barker identified the Defendant not once, but twice.

The first time, the first identification was between 12:15 and 12:20, he estimates.  Defendant was driving to the drug deal.  Investigator Barker and the Defendant passed each other, heading in opposite directions.

*Investigator Barker first told you he recognized Defendant's vehicle and then he saw the Defendant's entire face, in dredlocks and immediately recognized him, just like he did a couple of days earlier, on December 12, 2001.*  Except this time, he was only 10 to 12 feet from the Defendant, was at eye-level with him, the middle of the day, Ladies and Gentlemen, nothing to obstruct his view of the Defendant.  And he told you that he was 100 percent certain that it was Vergil McBean.

Trial Tr. at 523-24.

A review of the record reveals that the prosecutor's comments were based upon the trial testimony and not upon Barker's January report.  Investigator Barker testified that on December 18, 2001, he saw Petitioner driving a gray Chrysler with the license plate CR482U.  Trial Tr. at 225-27.  Barker recognized Petitioner because he had seen him "over 75 times" in the past, and had been present face-to-face with Petitioner between four and five times.  Id. at 228-29.  Barker also testified that on December 12, 2001, he was conducting surveillance in an unrelated case and saw Petitioner driving the same gray Chrysler.  Id. at 230-31.  Barker testified that Petitioner drove past his surveillance point within 50 feet, and he radioed to Officer Lawrence to stop Petitioner because he believed Petitioner had a suspended license.  Id. at 231-32.  Officer

-28-

Lawrence stopped Petitioner, and Barker identified him.  Id. at 232.  Officer Lawrence confirmed

that the driver was Petitioner.  Id. at 251-56.  Barker testified that on December 18, 2001, he had

a direct view of Petitioner's face as his car and Petitioner's car passed each other within ten feet,

and was "absolutely positive" the driver was Petitioner.  Trial Tr. at 232-33.  Petitioner cannot

establish that he suffered any "actual prejudice" as a result of the challenged statements because

the prosecutor did not misstate the evidence.  See Darden, 477 U.S. at 181-82 (prosecutor's

summation did not render trial fundamentally unfair where prosecutor did not manipulate or

misstate the evidence, and comments were in part invited by or responsive to the summation of

the defense); United States v. Coriaty, 300 F.3d 244, 256 (2d Cir. 2002) (" 'argu[ing] the

accuracy of the underlying, albeit contested, facts' is not prejudicial") (quoting United States v.

Zichettello, 208 F.3d 72, 103 (2d Cir.2000)).

        Moreover, the prosecutor's arguments that Investigator Barker was able to identify

Petitioner, and that his identification was reliable, were in fair response to Petitioner's attorney's

closing comments.  See Rivera, 22 F.3d at 438 (holding that when the defense has "attacked the

prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to

reply with 'rebutting language suitable to the occasion.' ") (citations omitted); Ayala v. Ercole,

2007 WL 1135560, at *17 (E.D.N.Y. Apr. 17, 2007) ("a prosecutor is permitted to respond in an

appropriate manner to attacks on the government's case by defense counsel during his

summation, including attacks on the credibility of government witnesses.").  Petitioner's counsel

attacked Barker's credibility, telling the jury that Barker had a "very convincing story" about how

he identified Petitioner twice on December 18, 2001 and was sure it was Petitioner because he

had seen him before.  Trial Tr. at 489-90.  He reminded the jury that Barker was in a moving

-29-

vehicle when he made the identifications.  Id. at 490-91.  Counsel argued that Barker's account of having identified Petitioner between 12:15 p.m. and 12:20 p.m. was contradicted by Investigator Navarro's report, which contained no entry of an identification by Barker during that time.  Id. at 491-93.  Further, counsel argued that Navarro's report had a notation that Barker identified Petitioner's car, but there was no mention of Petitioner.  Id. at 491. The prosecutor's comments were in response to counsel's attack on Barker's credibility and his ability to identify Petitioner, and were therefore proper. See Walker v. Cunningham, 2008 WL 4737664, at *5 (E.D.N.Y. Oct. 28, 2008) ("A prosecutor has broad latitude during summation, particularly when responding to defense counsel's summation.").

Further, the trial court instructed the jury prior to the summations that the attorney's statements "are not evidence," were "just their recapitulation of what they believe the evidence" showed, and that the jury would "determine what the facts in this case are."  Trial Tr. at 545. After the summations, the court repeated that the jury should "ignore any statement or argument made by the attorneys that is not based on the evidence.  Id. at 545.  The court again reminded the jury that the "summations of counsel . . . are not evidence."  Id. at 546.  The jury is presumed to have followed the trial court's instructions.  See Charlemagne v. Goord, 2008 WL 2971768, at *24 (S.D.N.Y. June 30, 2008) (jury presumed to follow instruction that it was their own recollection of the evidence that controlled and it was free to accept or reject counsel's arguments).

Finally, Petitioner did not object to any of the challenged comments at trial.  The Second Circuit has held that when there is no objection, "reversal is warranted only where the remarks amounted to a 'flagrant abuse.' " Coriaty, 300 F.3d at 255 (quoting United States v. Germosen,

139 F.3d 120, 128 (2d Cir.1998)).  The isolated comments about which Petitioner complains

cannot be characterized as "flagrant abuse" and "do not come within hailing distance of

prejudice."  <u>Coriaty</u>, 300 F.3d at 255.

   This ground of the petition is dismissed.

**D.**  **Missing Witness Charge**

   Petitioner next claims in Ground Three of his Petition that the trial court erred when it

refused to instruct the jury that Joan Chandler was a missing witness because she pleaded guilty

and had been sentenced for her role in the drug sales at issue and was not the target of any

ongoing investigation that might yield additional criminal charges.  Pet. at 9 and attached pages.

   Before Petitioner's trial began, Petitioner's attorney explained to the trial court that while

he understood the court's ruling with respect to Chandler's testimony and the co-conspirator

exception to the hearsay rule, it was his understanding that Chandler was going to testify.  Trial

Tr. at 7.  The next day, however, Chandler proved unwilling to testify due to "concerns about

federal immunity" because the case involved a drug crime.  <u>Id.</u> at 21.  The prosecutor was

unwilling to offer Chandler immunity, and Chandler, through her attorney,  confirmed that she

would not testify.  <u>Id.</u> at 22.  <u>See also</u> Dkt. No. 7, Ex. G at RA37-38 (excerpt from trial held on

11/21/02, where the prosecutor refused to offer Chandler immunity in exchange for her testimony

against Petitioner).  The court then determined that Chandler was an unavailable witness with no

objection from the prosecutor or from defense counsel.  Trial Tr. at 22.  During the jury

instruction, the trial court told the jury that "as a result of a hearing held outside the presence of

the jury, the Court has determined that Ms. Chandler is not available to be called as a witness by

either side in this case," and that it should not draw any inferences from the fact that she did not

appear as a witness.  Id. at 552-53.

The Appellate Division rejected Petitioner's claim that he was entitled to a missing witness jury instruction because Chandler invoked her Fifth Amendment right against self-incrimination.  McBean, 32 A.D.3d at 552 n. 2.  While acknowledging that Chandler pleaded guilty to her role in the drug transactions for which Petitioner was charged, the court noted that she "informed County Court that she would refuse to testify since she feared federal prosecution."  Id.  The Appellate Division noted that, based on Chandler's assertion, County Court determined that Chandler was an unavailable witness without objection from counsel, and properly denied counsel's request for a missing witness charge.  Id.  The Appellate Division's findings were not contrary to or an unreasonable application of clearly established Supreme Court precedent.

When reviewing an alleged error of state law in a jury instruction, a habeas court must consider "(1) whether the petitioner was erroneously deprived of a jury instruction mandated under state law and (2) if petitioner was erroneously denied the instruction under state law, whether the error was sufficiently harmful to violate a right guaranteed by federal law and to make the conviction unfair."  Moore v. West, 2007 WL 1302426, at *16 (N.D.N.Y. May 1, 2007) (Scullin, S.J) (citing Davis v. Strack, 270 F.3d 111, 123-24 (2d Cir. 2001)).  When the alleged error is one of omission, the petitioner's burden is "especially heavy" because it "is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  A finding that a petitioner "was erroneously deprived of a jury instruction to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights."  Davis, 270 F.3d at 123.

-32-

"A missing witness charge allows the jury to draw an adverse inference that the testimony of uncalled witnesses would have been unfavorable to the party that declined to call them." Glover v. Bennett, 2001 WL 1862807, at *5 (N.D.N.Y. Feb. 26, 2001) (Mordue, J. adopting Report and Recommendation of Sharpe, M.J.) (citation omitted).  To be entitled to a missing witness charge under New York law, Petitioner would have had to show that: 1) Chandler was knowledgeable about an issue material to the trial; 2) that she was expected to give noncumulative testimony favorable to the prosecution, and 3) that Chandler was available to the prosecution.  Farr v. Greiner, 2007 WL 1094160, at *13 (E.D.N.Y. Apr. 10, 2007); People v. Macana, 84 N.Y.2d 173, 196 (1994), lv. denied, 82 N.Y.2d 756 (1993); People v. Gonzalez, 68 N.Y.2d 424, 427 (1986). Whether a missing witness charge should be given lies in the sound discretion of the trial court.  Moore, 2007 WL 1302426, at *16.

Chandler was unavailable not only to the prosecutor, but to Petitioner as well, because she invoked her privilege against self-incrimination.  A missing witness instruction "need not be given where a witness is equally *unavailable* to both sides," as in a case where a witness invokes his or her Fifth Amendment privilege against self-incrimination.  Zanghi v. McGinnis, 2005 WL 3200279, at *11 (W.D.N.Y. Nov. 30, 2005) (emphasis in original); United States v. Myerson, 18 F.3d 153, 158 (2d Cir. 1994) (noting that other circuits have held that a witness invoking Fifth Amendment privilege is unavailable to both sides, so "no missing witness charge need be given").  This is so even though Chandler had already pleaded guilty in state court to charges related to her involvement in these drug transactions, because her fear of prosecution was directed at the possibility of federal prosecution, especially in light of the fact that she did not enjoy immunity.  See Ohio v. Reiner, 532 U.S. 17, 21 (2001) ("We have held that the privilege's

-33-

protection extends only to witnesses who have "reasonable cause to apprehend danger from a direct answer.") (citations omitted); United States v. Rivera, 60 Fed. Appx. 854, 2003 WL 1092682, at *3 (2d Cir. Mar. 12, 2003) (slip op.) ("The Fifth Amendment privilege is not lost upon a plea of guilty when a reasonable risk of incrimination on other charges still exists."); United States v. Rodriguez, 706 F.2d 31, 36-37 (2d Cir. 1983) ("the Fifth Amendment privilege is not lost after a witness has pleaded guilty if the witness is still subject to a realistic risk of incrimination on other charges, or if the desired testimony about the transaction in question would give rise to a risk of incrimination in connection with other transactions.").

It is also questionable whether Chandler's testimony would have been favorable to the prosecution.  In fact, the opposite appears to be true.  Petitioner claims that Chandler signed a statement "indicating that she cannot recall seeing [Petitioner] at the scene of any of the three undercover drug buys."  See Pet. at Ground Three, attached pages.  In the statement, Chandler explains that "I have no . . . memory of Virgil McBean being in a gray car during January "2002" and "December 2001" during any drug transactions, or hand me any drugs at the date's stated."  Dkt. No. 7, Ex. B at R244.  Chandler further stated "[t]hat would of been my testimony at trial if I would of Testified."  Id.  These statements do not establish that Chandler had knowledge about the events in question, much less that she would have testified favorably to the prosecution.  See Moore, 2007 WL 1302426, at *18 (petitioner's claim that he was improperly denied a missing witness charge did not provide grounds for habeas relief where petitioner failed to show, among other things, that the witness would have testified favorably for the prosecution).

In sum, Petitioner has failed to show that he was entitled to a missing witness charge under New York law, and this claim is denied.

-34-

**E.      Confrontation Clause**

Petitioner also argues in Ground Three of his petition that the trial court erred when it permitted the prosecutor to present hearsay statements made by Chandler to Investigator Fendick that implicated Petitioner as her drug supplier because the statements violated the Confrontation Clause and the Supreme Court's ruling in Crawford v. Washington, 541 U.S. 36 (2004). See Pet. at Ground Three and attached pages.

Petitioner raised this claim in his section 440 motion, and the trial court rejected it, ruling that Chandler's statements, "admitted as statements of a co-conspirator unavailable at trial, do not constitute the type of 'testimonial' hearsay that has been rendered inadmissible under the ruling in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004)." Dkt. No. 7, Ex. E at R918. The Appellate Division affirmed, ruling that since Chandler was unaware of Fendick's status as an undercover officer, any statements she made to him "lacked the formality of testimony and were not made in anticipation of prosecution." McBean, 32 A.D.3d at 552. Since the statements were not "testimonial," they were not "subject to exclusion under the Crawford framework." Id. That ruling was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., amend VI. See Pointer v. Texas, 380 U.S. 400 (1965) (stating that a defendant's Sixth Amendment right to confront witnesses is guaranteed in both federal and state criminal proceedings). Prior to the Supreme Court's ruling in Crawford v. Washington, 541 U.S. 36, 68-69 (2004), hearsay statements were admissible if the declarant was "unavailable" to testify

-35-

and the statement bore "adequate 'indicia of reliability.' " <u>Ohio v. Roberts</u>, 448 U.S. 56, 66

(1980).  Reliability could be established by "a showing of particularized guarantees of

trustworthiness," or be inferred from the fact that the evidence fell "within a firmly rooted

hearsay exception." <u>Roberts</u>, 448 U.S. at 66; <u>see</u> <u>United States v. Williams</u>, 506 F.3d 151, 157

(2d Cir. 2007), <u>cert</u>. <u>denied</u> 128 S. Ct. 1727 (2008).

 In <u>Crawford,</u> the Supreme Court barred the admission of "testimonial statements of a

witness who did not appear at trial unless he was unavailable to testify, and the defendant had

had a prior opportunity for cross-examination." <u>Davis v. Washington</u>, 547 U.S. 813, 821 (2006)

(citing <u>Crawford</u>, 541 U.S. at 53-54).  By so ruling, the Court "replaced the <u>Roberts</u> firmly

rooted/particularized guarantee of trustworthiness test for testimonial statements." <u>Ko v. Burge</u>,

2008 WL 552629, at *10 (S.D.N.Y. Feb. 26, 2008) (citing <u>Crawford</u>, 541 U.S. at 68).  Although

it declined to provide an exhaustive list of what types of statements were testimonial, the

Supreme Court stated that the term included "prior testimony at a preliminary hearing, before a

grand jury, or at a former trial; and to police interrogations." <u>Crawford</u>, 541 U.S. at 68.

 The Supreme Court did not clearly address whether non-testimonial statements were still

subject to Confrontation Clause analysis until its ruling in <u>Davis v. Washington</u>, where it held

that the Confrontation Clause excludes only out-of-court testimonial statements and does not

apply to non-testimonial statements.  <u>See</u> <u>Davis</u>, 547 U.S. at 821; <u>Williams</u>, 506 F.3d at 157;

<u>United States v. Feliz</u>, 467 F.3d 227, 231 (2d Cir. 2006).[9]  As the Supreme Court has made clear,

---

 [9] The holdings in <u>Crawford</u> (decided March 8, 2004), and <u>Davis</u> (decided June 19, 2006)
apply to Petitioner's case because they were both decided before the Appellate Division affirmed
his conviction on August 3, 2006 and before Petitioner's conviction became final on December
11, 2006.  <u>See</u> <u>Garcia v. Burge</u>, 2008 WL 627508, at *8 n.8 (S.D.N.Y. Feb. 28, 2008) (citing
(continued...)

-36-

"[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  Davis, 547 U.S. at 821; see Whorton v. Bockting, 127 S. Ct. 1173, 1176 (2007) (noting that the decision in Crawford eliminated "Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements.").

Here, Petitioner argues that Chandler's statements were "essentially testimonial in nature as it was the voice of Joan Chandler in effect being presented to the jury testifying as to whom she was calling to arrange a drug sale."  Pet. at Ground Three, attached pages.  Yet as the Appellate Division noted, Chandler's statements implicating Petitioner as her drug supplier "lacked the formality of testimony and were not made in anticipation of prosecution."  McBean, 32 A.D.3d at 552.  The record establishes that Chandler was also a target of the investigation at issue and did not know that Investigator Fendick was an undercover police officer.  See Trial Tr. at 95, 129-30.  There was apparently no sworn testimony taken from Chandler by Fendick relating to her statements implicating Petitioner as her supplier, nor was there evidence of "structured police questioning."  Davis, 547 U.S. at 829 (quoting Crawford, 541 U.S. at 53 n.4). Her statements were made in an unofficial setting, Chandler believed Fendick was a client, and her statements implicated her as jointly responsible for the drug transactions because she facilitated them by contacting Petitioner.  In fact, Chandler admitted during her plea colloquy that clients would call her, she would call the "drug dealer and go get the drugs," and that she intended to make sure a sale took place, working with at least one other person.  Dkt. No. 7, Ex.

---

[9](...continued)
Whorton v. Bockting, 127 S. Ct. 1173, 1181 (2007)).

B at R262-63.  She further admitted that she engaged in this behavior on the dates for which she

and Petitioner were charged with criminal sale of a controlled substance.  Id.

Moreover, the trial court apparently ruled[10] that Chandler's statements to Fendick were

admissible under the co-conspirator exception to the hearsay rule because they were made in

furtherance of the conspiracy between Chandler and Petitioner to sell cocaine, and were designed

to facilitate that result.  See Dkt. No. 7, Ex. B. at R252-72; Ex. E at R918; Trial Tr. at 7-8.  The

Supreme Court has ruled that statements made in "furtherance of a conspiracy" are not

testimonial.  Crawford, 541 U.S. at 56.; see Bourjaily v. United States, 483 U.S. 171, 181 (1987)

(admission of statements made unwittingly to an undercover informant by a declarant not

available at trial did not violate the Confrontation Clause, cited in Crawford as example of a pre-

Crawford case in which non-testimonial statements were properly admitted); United States v.

Logan, 419 F.3d 172, 178 (2d Cir. 2005) ("In general, statements of co-conspirators in

furtherance of a conspiracy are non-testimonial." ).

Since Chandler's statements were not testimonial, their admission into evidence did not

violate the Confrontation Clause or the Supreme Court's ruling in Crawford.  See Williams, 506

F.3d at 157 ("Because the Confrontation Clause does not bar such nontestimonial statements,

whatever their guarantees of trustworthiness . . . our Confrontation Clause inquiry is at an end.").

This claim is dismissed.

**F.     Claim that the Trial Court Improperly Denied McBean's CPL § 440 Motion
Without a Hearing**

---

[10] While defense counsel references the court's ruling regarding the admission of
Chandler's statements under the co-conspirator exception to the hearsay rule, Trial Tr. at 7-8, no
copy of the trial court's decision was provided to this Court.

Petitioner claims in Ground Four of his petition that the state court improperly denied his section 440 motion without holding an evidentiary hearing because new evidence was discovered in his case following his conviction, including an "excited utterance" made by Belinda McCoy that she was actually the person in the gray car making the drug sales for which McBean was convicted; a statement by Chandler that she told the District Attorney's Office she had no memory of being given or having sold drugs by McBean on the dates in question; and a letter from Heather McEver to the court in which she stated she spoke to McBean on December 3, 2001 at his home in Binghamton, and he told her that he could not travel to Ithaca the next day to attend a birthday party.  Pet. at 11 and attached pages.

State prisoners have no federal constitutional right to post-conviction proceedings in state court.  Pennsylvania v. Finley, 481 U.S. 551, 557 (1987).  Thus, to the extent that Petitioner is challenging alleged procedural errors by the trial court in deciding his section 440 motion, including his claim that the court denied the motion without holding a hearing, those claims are not cognizable on habeas review.  Ferrer v. Superintendent, 2008 WL 2967633, at *11 (N.D.N.Y. Jul. 25, 2008) (Mordue, C.J.) (" '[f]ederal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings.' ") (quoting Falas v. Phillips, 2004 WL 1730289, at *13 (S.D.N.Y. Aug. 3, 2004), adopted 2005 WL 756886 (S.D.N.Y. Apr. 1, 2005)); see Jones v. Duncan, 162 F. Supp. 2d 204, 217 (S.D.N.Y. 2001) (stating that "habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings," and denying habeas relief on claim that trial court failed to hold an evidentiary hearing on post-conviction motions) (quoting Franza v. Stinson, 58 F. Supp. 2d 124, 151 (S.D.N.Y. 1999)).

Further, the Appellate Division granted Petitioner leave to appeal the trial court's denial

of his section 440 motion, and that appeal was consolidated with Petitioner's direct appeal.  In its

decision denying the section 440 motion, the state court noted that "[v]irtually all of

the same grounds set forth in the present 440 motion were presented in [McBean's] CPL Article

330 motion, which was summarily denied by this Court at the time of sentencing on May 5,

2003."  Dkt. No. 7, at R916.  The court ruled that the statements and affidavits McBean produced

after trial did not constitute newly discovered evidence within the meaning of CPL §

440.10(1)(g).  Id. at R918.  The Appellate Division affirmed, finding that the items Petitioner

alleged constitutes new evidence "merely impeached former evidence or was cumulative of prior

testimony."  McBean, 32 A.D.3d at 552.  The court further held that Petitioner had not shown

that the evidence could not have been discovered prior to trial with due diligence, and the court

failed "to see how such evidence could have changed the outcome of the trial."  Id.  Petitioner

raised and fully litigated each of his claims regarding the denial of his section 440 motion on

appeal.  "[T]hus he was not prejudiced by any alleged violation [of state procedural rules]."

Parker v. New York, 2006 WL 864272, at *5 (S.D.N.Y. Apr. 5, 2006).  The trial court's failure

to hold a hearing before denying Petitioner's section 440 motion is thus insufficient to constitute

a denial of Petitioner's constitutional rights, and this claim is denied.


IV.    **CONCLUSION**

        **WHEREFORE**, based on the foregoing, it is hereby

        **ORDERED,** that Petitioner's petition for a writ of habeas corpus (Dkt. No. 1) is

**DENIED and DISMISSED in its entirety**; and it is further

        **ORDERED**, that no Certificate of Appealability shall issue with regard to any of

-40-

Petitioner's claims; and it is further

ORDERED, that the Clerk of the Court shall serve a copy of this Order on Petitioner by

regular mail.

IT IS SO ORDERED.

DATED:        December 09, 2008
              Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge